UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| RUSTY W. BESEAU,<br><br>                    Plaintiff,<br><br>vs.<br><br>CAROLYN W. COLVIN,<br>Commissioner of Social Security,<br><br>                    Defendant. | Case No. 2:14-cv-01952-GMN-GWF<br><br>**REPORT AND**<br>**RECOMMENDATION**<br><br>Motion for Reversal and/or Remand (#19)<br>Cross-Motion to Affirm (#24) |

This case involves judicial review of administrative action by the Commissioner of Social Security denying Plaintiff Rusty Beseau's claim for disability benefits under Title XVI of the Social Security Act. Plaintiff's Complaint (#3) was filed December 19, 2014. Defendant's Answer (#11) was filed February 20, 2015, as was a certified copy of the Administrative Record (the "AR"). (*See* #12) This matter has been submitted to the undersigned United States Magistrate Judge for Findings and Recommendations on Beseau's Motion for Reversal and/or Remand (#19), filed on May 27, 2015, and the Commissioner's Cross-Motion to Affirm and Response to Plaintiff's Motion for Reversal and/or Remand (#24), filed on July 23, 2015. Plaintiff did not file a reply brief.

## BACKGROUND

**A.     Procedural History.**

On July 16, 2011, Plaintiff filed a Title II application for a period of disability and disability insurance benefits. Plaintiff also filed a Title XVI application for supplemental security income on July 16, 2011. In both applications, Plaintiff alleged that his disability began on December 3, 2006. AR 22. The Social Security Administration denied Plaintiff's claims on August 29, 2011. AR 84, 88. Plaintiff then filed for reconsideration of both claims, which were denied on July 18, 2012. AR 93, 96. Plaintiff requested a hearing before an Administrative Law ("ALJ") and testified at a hearing before the ALJ on

June 3, 2013. AR 44-79. At the hearing, Plaintiff amended his alleged onset date to May 30, 2011, thereby foregoing his Title II claim[1] and proceeded solely on his Title XVI claim. AR 47-48, 162. Vocational Expert Susan L. Allison also testified at the hearing. AR 72-78. The ALJ determined that Plaintiff was not disabled from May 30, 2011 through June 20, 2013. AR 29. Plaintiff appealed the decision of the ALJ to the Appeals Council on August 9, 2013. AR 15. The Appeals Council denied Plaintiff's request for review on September 25, 2014. AR 1-6. Plaintiff then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).

      **B.**      **Factual Background.**

Plaintiff Rusty Beseau was born on March 5, 1968. AR 139. He is 5'8" tall and weighed 200 pounds in August 2011. AR 172. Plaintiff obtained his high school diploma in 1988. AR 172. At the time of the hearing, Plaintiff resided in a two-story home with a co-tenant who was in his 70s and also suffered from a host of medical problems. AR 50-52.

      **1. Plaintiff's Disability/Work History Reports and Hearing Testimony**

In his initial August 2011 disability report, Plaintiff claimed he was disabled since December 3, 2006 because he was a "[f]elon-5 years prison, degenerative d[isc disease] in [the] neck, [and] turnshoulder [sic]." AR 171-172. Plaintiff denied taking any medications and did not have any future medical appointments scheduled to address his alleged disabling conditions. AR 174. Plaintiff did not provide any other information in this report.

Plaintiff submitted a second disability report in September 2011. AR 176-183. Plaintiff stated that since his prior report the circulation in his legs had gotten worse and that he had more problems with his arthritis. AR 178. Plaintiff reported that he had scheduled a visit with UMC Craig Primary Care in October 2011. AR 179. He was currently taking Tylenol for his pain and reported that there had been no other changes. AR 180-181.

Plaintiff also submitted a work history report dated October 24, 2011. AR 184-192. Plaintiff listed the following positions and dates worked:

---

[1] The amended alleged onset date was subsequent to his date last insured of June 30, 2010. As a result, Plaintiff was required to waive his Title II claim.

```
1.    Automotive Technician: 2010-2011
2.    Forestry Firefighter: 2009-2010
3.    Security Officer: 2008-2009
4.    Security Officer- Armed: 2007-2008
5.    Cashier/Sales Clerk/Stock Associate: 2006-2007
6.    Certified Protective Officer: 2005-2006
7.    Security Enforcement Officer: 2004-2005
8.    Security Guard: 2000-2004
9.    Security Officer: 2000-2004
10.   Maintenance Worker I: 1995-2000
```

AR 184.

Plaintiff submitted a third disability report in July 2012. AR 193-199. He stated that his pain was increasing and that "the right side of the body is the worst" and that he had "limited mobility in [his] right shoulder." AR 195. Plaintiff reported that his pain got worse daily. Plaintiff listed UMC Rancho Primary Care as his medical provider and stated that he was currently taking gabapentin and tramadol for pain. AR 196-197. He stated that his daily activities were affected because he was afraid of falling due to his condition and that "there [was] little [he could] do without causing the pain to increase." AR 197.

Plaintiff testified at a hearing before the ALJ on June 3, 2013. AR 46-72. He stated that he lived in a two story house that was owned by Plaintiff's friend. AR 50-51. Plaintiff testified that he had been in prison on a charge of battery with great bodily harm, which was the result of an unfortunate incident. AR 53. He worked as a maintenance worker for Genesee County from 1998 to 2000. AR 53. He did "landscape kind of things" and "everything to do with the park." AR 53. He eventually became a crew supervisor. AR 54. Plaintiff testified that he also worked as a security guard. Over time, he held armed and unarmed positions, but most of the time he was unarmed. AR 54. While he worked at Green Valley Security, his main duties were sitting in a vehicle and patrolling the property. AR 55-56.

Plaintiff testified that he could not work because he had trouble concentrating and remembering anything due to the pain in his neck. AR 59-60. He had lower back pain that would "get hot and then it [would go] up into [his] neck." AR 60. He would feel cracking and popping in his shoulder and neck and if he moved wrong his neck would catch. AR 60. His neck would "kink up for a week or so" and that would happen quite often. AR 60. He was unable to get a good night of sleep due to the pain in his legs. He did not have surgery on his back, neck, or shoulder. AR 60. The pain medication he took

made his pain tolerable but it was always constant. AR 61. Plaintiff's continuous pain caused him to always be tired and sleep for most of the day. AR 61. When asked why he did not take medication to help him sleep, Plaintiff testified that he did not have a reason other than he did not want to take his current pain medication. AR 61-62.

Plaintiff testified that he used a walker when his leg gave out, which was usually two to three times a week. AR 62. He broke his right knee in 2005 and had problems with it ever since. If he turned his leg wrong, it felt like it re-sprained and made him unable to walk. AR 62. Generally, he tried not to walk. Plaintiff stated that he rarely drank alcohol due to the incident that resulted in his felony conviction. AR 63. He did not use any illegal substances. AR 63. Plaintiff testified that although he had a driver's license he did not drive because his car needed an engine and plates and he did not have insurance. AR 63-64.

Plaintiff testified that on a typical day he usually slept until 11:00 a.m. or 12:00 p.m. AR 64. He would then make breakfast or have someone help make him breakfast. He kept a microwave, toaster, and toaster oven in his room because it was hard for him to get around the house and walk too much. AR 64. The rest of the day was spent watching TV, reading books, listening to music, and making phone calls. Sometimes Plaintiff's brother or female friend would come over to visit and help Plaintiff with laundry and other things. AR 64. Plaintiff testified that if he went grocery shopping he used one of the electric carts, but his girlfriend usually did his grocery shopping for him. AR 72.

Plaintiff stated that he cannot lift his right arm over his head. AR 65. He had an accident in 2006 in which the bike he was riding slid into the side of the street, flipped him off and resulted in broken ribs and a torn shoulder. AR 65. He has not had surgery on his right shoulder. Plaintiff is left-handed. While most of his problems were with his right arm, he stated that he had some problems with his left shoulder as well. AR 65. He thought that he was having problems with his left shoulder because he was using it so much. AR 66.

Plaintiff testified that if he shifted back and forth on his feet, he could usually stand for about five to ten minutes. AR 66. After that he had to sit down because of the pain in his back and both legs. AR 66. He could only walk on a level surface for about five to ten minutes before having to sit down due to pain. AR 67. If he walked for too long he would "end up paying for it later because [he had] to

4

double up on the pain meds." AR 67. He could only sit for about fifteen to thirty minutes because the pain would build in his lower back and go up to his neck and into his right arm. AR 67.

Upon examination by Plaintiff's attorney, Plaintiff stated that the pain in his neck was constant and the pain would radiate into his arms. AR 67. The pain in his right arm was "a striking pain . . ., a stabbing pain." AR 68. He had numbness and tingling in his wrist, hands, and sometimes in his ankles. If he turned his head, "[i]t kinks up, it crunches, pops, [he could] hear it." AR 68. He would have striking pain so he would not turn his head too much. His doctor referred him to pain management but when he called, the office was booked for the year. AR 69. He also took three medications for his neck pain. He had lower back pain three to eight times a day that would last for hours. This back pain was caused by standing too long, trying to bend over, or trying to lift anything. AR 69. Plaintiff stated that he could only lift about a gallon of milk that was half full with both hands, which would be around 4 pounds. AR 69-71. His back pain did not radiate down his legs. Plaintiff testified that he cannot walk up and down stairs because of the problems with his knee. AR 71. His right knee pain was always constant and he did not receive treatment for it aside from pain medication. AR 72.

**2. Vocational Expert's Testimony**

Vocational Expert ("VE") Susan L. Allison testified at the June 3, 2013 hearing. After establishing Plaintiff's prior work history as a gate or building guard (light work), security guard (light work), body guard (light work), and maintenance worker or gardener (medium work), AR 72-73, the ALJ asked the VE the following hypothetical question:

> [I]f we had a person the claimant's age, education, and experience being capable of working at a light exertional level, so that would take out the warehouse or maintenance worker . . ., [a]nd if that person could only perform postural occasionally except no climbing of ropes, ladders, or scaffolds. Is limited to only occasional rotation, flexion, or extension of the neck. Only occasional bilateral overhead reaching. No restriction at any other planes. Must avoid concentrated exposure to extreme cold, excessive vibration, hazardous machinery, and unprotected heights and operational or moving machinery. With those limitations could such a person work as a gate, building guard, security guard or bodyguard?

AR 73.

The VE responded that the hypothetical person would be able to work in all of those positions. AR 73. The ALJ then asked whether these jobs would still be available if the person was limited to

"only occasionally reach[ing] overhead with the dominate left upper extremity but never reach[ed] overhead with the non-dominate right upper extremity." AR 73-74.  The VE testified that all positions would still be available because "overhead reaching isn't something that is generally performed in those occupations." AR 74.  The ALJ then altered the hypothetical once more and asked if these positions would be available if the person was "limited to standing and walking only two hours in an eight hour work day." AR 74.  The VE stated that with the added limitation, the hypothetical person would be unable to perform work in these positions as they are described by the Dictionary of Occupational Titles ("DOT").  AR 74.  However, the VE stated that the person would be able to work as a gate or building guard as Plaintiff described it— sitting in a car and patrolling most of the time.  AR 74-75, 188.

The ALJ asked the VE whether the person, as described in the original hypothetical, would be able to perform any other work at the light exertional level.  AR 75-76.  The VE responded:

> He could do ticket taker which is light unskilled work SVP of 2, DOT 344.667-010.  In Nevada approximately 1,500 positions, nationally 87,000 positions.
> . . .
> There would be assembly work such as assembler, plastic hospital parts, light unskilled SVP of 2, DOT 712.687-010.  Locally 900 positions, nationally 224,000 positions.
> . . .
> [O]ffice helper, light unskilled SVP of 2, DOT 239.567-010.  Locally approximately 1,100 positions, nationally 116,000 positions.

AR 76.

The ALJ asked whether these jobs would be available if the hypothetical person was limited to standing and walking for two hours in an eight-hour work day.  AR 76.  The VE responded that all positions would be affected.  The hypothetical person could not work as a ticket taker.  The number of available assembly positions would be eroded by seventy-five (75) percent.  The number of available officer helper positions would be eroded by fifty (50) percent.  AR 76-77.  The ALJ then asked how these positions would be affected if the hypothetical person was unable to reach overhead with his right non-dominate upper extremity.  The VE testified that the limitation would not further affect the jobs. AR 77.

. . .

1   The ALJ then inquired to what sedentary jobs would be available for the person described in the
2   original hypothetical. AR 77. The VE responded:

> There is order clerk food and beverage which is sedentary unskilled SVP
> of 2, DOT 209.567-014. Locally approximately 200 positions, nationally
> 20,000.
> . . .
>
> There is final assembler, sedentary unskilled SVP of 2, DOT 713.687-
> 018. Locally approximately 100 positions, nationally 101,000 positions.
> . . .
>
> Call out operator, sedentary unskilled SVP of 2, DOT 237.367-014.
> Locally approximately 250 positions, nationally 16,000.

AR 77-78.

The ALJ again asked whether these positions would be affected if the hypothetical person was limited to standing or walking for two hours in an eight-hour work day and could only reach overhead "with his non-dominate left [sic] upper extremity." AR 78. The VE testified that none of these positions would be eliminated due to these limitations. AR 78. Plaintiff's counsel asked whether the hypothetical person would be able to perform any of the aforementioned jobs if he "would need additional unscheduled breaks of up to 10 minutes every hour in addition to regularly scheduled breaks." AR 78. The VE testified that the person would not be able to sustain competitive employment because that limitation "would be considered a special accommodation." AR 78.

### 3. Medical Records and Reports

Plaintiff was initially seen by Maria A. Martinez, M.D. at University Medical Center ("UMC") on December 13, 2011. AR 234-236. Plaintiff complained of chronic pain in his right knee, both shoulders, and neck. AR 234. He reported that he was not afraid of falling and did not have any physical limitations. AR 234. Plaintiff stated that he had nerve damage in the past and that his legs were ice cold at times. AR 235. Upon examination, Plaintiff was found to be in no acute distress. He was alert and all systems were negative. AR 235. Dr. Martinez noted that Plaintiff had right knee crepitus and a limited range of motion in his right shoulder. AR 236. She diagnosed Plaintiff with right shoulder, right knee, and cervical spine pain. AR 236. Dr. Martinez ordered x-rays of the right shoulder, right knee, and cervical spine. AR 234.

. . .

Plaintiff presented for a followup with Dr. Martinez on December 28, 2011. AR 231. Plaintiff's complaints and the examination findings were the same as his previous visit. AR 231-232. Dr. Martinez ordered an MRI of the cervical and lumbar spine, and of the right knee. AR 231. Thereafter, Plaintiff was seen by Dr. Martinez for followup visits on March 8, 2012, May 21, 2012, and August 12, 2013 with no significant changes. AR 289-291, 229-230, 294.

An MRI of the cervical spine was performed on April 13, 2012. AR 248-249. The MRI showed normal alignment and no fracture or spondylolisthesis. AR 249. There was cervical spondylosis with degenerative disk [sic] disease most marked at C6, focal narrowing of the left aspect of the thecal sac at C6 though C7, that may impinge upon the exiting left C7 nerve root. AR 249. The MRI also showed mild right and moderate left neural foraminal narrowing at the C6 through C7 level. Otherwise, there was no significant spinal canal or neural foraminal narrowing at any other level. AR 249. An MRI of the lumbar spine was also performed on April 13, 2012. AR 246-247. It showed mild degenerative disk disease at L5-S1 with very mild left foraminal stenosis. AR 247.

On April 26, 2012 Plaintiff underwent an electromyography[2] ("EMG"). He reported pain in his right arm and right leg. AR 251. The EMG showed no evidence of peripheral neuropathy, no evidence of cervical or motor radiculopathy in either right or left arm, no evidence of lumbar motor radiculopathy in either right or left leg, no evidence of carpal tunnel syndrome in either hand, normal ulnar nerves bilaterally, normal sural nerves bilaterally which effectively ruled out peripheral neuropathy, and no evidence of tarsal tunnel syndrome in the right foot. AR 252.

At the request of the Bureau of Disability Adjudication, Plaintiff was examined by Dr. Zev Lagstein, M.D. on February 22, 2012. Plaintiff complained of pain in both knees and shoulders and reported that x-rays of his cervical spine revealed degenerative joint disease. AR 239. A review of Plaintiff's systems produced unremarkable results. AR 240. Plaintiff's station and gait appeared

---

[2] The document provided by UMC, AR 251, is titled Electroencephalogram ("EEG"). As noted by the government, the mayoclinic.org states that an EEG may be useful in diagnosing brain disorders, especially epilepsy. *See* http://www.mayoclinic.org/tests-procedures/eeg/basics/why-its-done/prc-20014093. The report described the procedure as an "EMG" which is an electromyography. An EMG is used to diagnose a nerve or muscle disorder. *See* http://www.mayoclinic.org/tests-procedures/electroconvulsive-therapy/basics/why-its-done/prc-20014183.

1  normal. His muscle strength was noted as a 5 out of 5 throughout. AR 240. Dr. Lagstein was unable
2  to objectively test Plaintiff's range of motion in his shoulders because Plaintiff complained of pain.
3  However, Dr. Lagstein stated that "inspection and palpation [of Plaintiff's shoulders] seem[ed] to be
4  unremarkable." AR 241. Dr. Lagstrein further stated:

> Range of motion of all large and weightbearing joints was normal. There
> was no evidence of joint swelling, redness, or tenderness. Special
> attention was given to both knees where there was no evidence of knee
> effusion or crepitus and range of motion appeared to be normal. No
> muscle atrophy, deformations, fasciculations, or spasms.

AR 241.

Dr. Lagstein found that Plaintiff suffered from pain in both knees and shoulders but the cause was unclear. He noted that per Plaintiff's representations, he had degenerative joint disease of the cervical spine, but found that Plaintiff's range of motion of his lumbosacral spine was normal. AR 241.

Dr. Lagstein filled out a medical source statement. He stated that Plaintiff could occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds. AR 242. Plaintiff could stand and/or walk for about six hours in an eight-hour work day and did not need an assistive device. Plaintiff could sit for about six hours in an eight-hour work day and standard breaks would provide sufficient relief if he needed to alternate between sitting and standing. Plaintiff could occasionally climb ramps, stairs, ladders, and scaffolds. Plaintiff could also occasionally balance, stoop, bend, kneel, crouch, squat, and crawl. AR 242. Dr. Lagstein found that Plaintiff was not limited in his ability to reach, finger, handle objects, hear, see, speak, or travel and was only restricted from working with vibrations. AR 243.

A non-examining State agency medical consultant, Julius Villaflor, M.D., completed a Physical Residual Functional Capacity Assessment form on July 16, 2012. Dr. Villaflor found that Plaintiff could occasionally lift and/or carry 20 pounds, frequently left and/or carry 10 pounds, stand and/or walk for about six hours in an eight-hour work day, sit for about six hours in an eight-hour work day, and was unlimited in pushing or pulling. AR 257. Plaintiff could occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl, could frequently balance, and could never climb ladders, ropes, or scaffolds. AR 258. Plaintiff was limited in his ability to reach overhead. AR 259. Plaintiff was to avoid concentrated exposure to extreme cold and hazardous machinery. AR 260. Dr. Villaflor stated that

"[c]onsidering the issue [o]f pain, abnormal C spine MRI and the context of a required maintenance of a 40 hour per week work schedule, some benefit of the doubt is given to [Plaintiff]." AR 263. He then concluded that "the overall evidence still support[ed] the ability to do at least light work." AR 263.

### C.     ALJ's Decision.

In his June 20, 2013 decision, the ALJ determined that Plaintiff was not disabled from May 30, 2011 through the date of the decision because Plaintiff possessed the residual functional capacity ("RFC") to perform work at the light exertional level as defined in the Dictionary of Occupational Titles and the Social Security Regulations. AR 25. In reaching this conclusion, the ALJ followed the five-step process set forth in 20 C.F.R. § 404.1520(a)-(f). First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged amended onset date of May 30, 2011. AR 24. Second, he found that Plaintiff had severe impairments including "degenerative disc disease of the cervical spine and degenerative joint disease of the right knee." AR 24. The ALJ noted that Plaintiff suffered from degenerative disc disease of the lumber spine but found that it caused "less than minimal limitation in his ability to engage in work-related activities and is, therefore, non-severe." AR 25. Third, the ALJ found that Plaintiff's impairments did not meet and were not medically equivalent to any condition listed in Appendix 1, Subpart P, of 20 C.R.F. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926. AR 25.

Prior to step four of the analysis, the ALJ found:

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CRF 404.1567(b) and 416.967(b) except he can only occasionally balance, stoop, kneel, crouch, and crawl, or climb ramps and stairs. He can never climb ladders, ropes, or scaffolds. He may only occasionally flex, extend, and rotate his neck. He must avoid concentrated exposure to extreme cold, excessive vibration, hazardous machinery, unprotected heights, and operational control of moving machinery.

AR 25.

The ALJ found that Plaintiff's complaints concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the RFC assessment because they were not supported by the objective medical evidence. AR 26. The ALJ then summarized the medical evidence contained in the record. He noted that the MRI of the cervical spine showed

normal cervical alignment and that degenerative disc disease/spondylosis were most prominent at C6-C7. AR 26. The EMG on April 26, 2012 showed normal findings of all four extremities. There was no evidence of peripheral neuropathy or cervical motor radiculopathy in either the right or left arm. AR 26. The ALJ also noted that Plaintiff had been diagnosed with right knee pain in December 2011.

The ALJ gave Dr. Lagstein's opinion some weight. He rejected Dr. Lagstein's opinion that Plaintiff could "occasionally lift and/or carry 50 pounds, [and] frequently lift and/or carry 25 pounds." AR 27. The ALJ found that lifting that amount of weight would "cause an exacerbation of [Plaintiff's] shoulder and knee pain by causing additional strain." AR 27. He found, however, that Plaintiff did not have significant standing or walking limitations. The ALJ further stated that there was no evidence of an impairment that would cause more than a minimal limitation on Plaintiff's ability to sit. AR 27. The ALJ reiterated that Dr. Lagstein's examination of Plaintiff resulted in mostly normal and unremarkable findings. AR 27.

The ALJ also gave some weight to Dr. Villaflor's opinion. The ALJ found that Plaintiff could not lift any weight heavier than assessed by Dr. Villaflor, which was to occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. The ALJ found that anything heavier would cause Plaintiff additional strain and exacerbate his shoulder and knee pain. AR 27.

Based on the ALJ's RFC assessment, he found at step four that Plaintiff was capable of performing his past relevant light work as a gate guard, security guard, and body guard. The ALJ also made an alternative finding at step five that Plaintiff was capable of performing other light or sedentary work available in the national and local economy as identified by the VE. AR 28-29.

In reaching this conclusion, the ALJ stated that Plaintiff was considered a younger individual at the time of his alleged onset date and that he had a high school education. AR 28. Further, the ALJ found that there was insufficient evidence to support a limitation to standing and/or walking for only two hours in an eight-hour workday. AR 29. The ALJ also found that there was insufficient evidence to support a restriction to never perform any overhead reaching or lifting with either arm. AR 29. He noted that if such limitations were accepted, Plaintiff would still be able to perform the jobs described by the VE. The ALJ, therefore, found that Plaintiff was not disabled from May 30, 2011 through the date of his decision. AR 29.

**DISCUSSION**

**I.      Standard of Review.**

A federal court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper legal standards. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991). The Ninth Circuit has defined substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal. 2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001). The Court must look to the record as a whole and consider both adverse and supporting evidence. *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). Where the factual findings of the Commissioner of Social Security are supported by substantial evidence, the District Court must accept them as conclusive. 42 U.S.C. § 405(g). Hence, where the evidence may be open to more than one rational interpretation, the Court is required to uphold the decision. *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)). *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The court may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision. *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the findings. *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir. 1974)). In order to enable the court to properly determine whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based." *Lewin*, 654 F.2d at 635.

In reviewing the administrative decision, the District Court has the power to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In the alternative, the District Court "may at

any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

## II. Disability Evaluation Process

To qualify for disability benefits under the Social Security Act, a claimant must show that:

(a) he/she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less that twelve months; and

(b) the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.

*Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A). The claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996). If the claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work that exists in the national economy. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998).

## III. Whether the ALJ Erred in Rejecting Plaintiff's Credibility

Plaintiff primarily attacks the ALJ's decision on the grounds that he did not provide adequate reasons to reject the credibility of his testimony regarding the severity of his pain and other symptoms. As Plaintiff notes, the only statement made by the ALJ with respect to Plaintiff's credibility was as follows:

> The claimant's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the above residual functional capacity assessment, because they were not supported by objective medical signs and findings of the record as a whole under SSR 96-7p.

AR 26.

In the absence of affirmative evidence showing that the claimant is malingering, the ALJ's reasons for rejecting the credibility of the claimant's testimony regarding the severity of his pain or other symptoms must be specific, clear and convincing. *Molina v. Astrue*, 674 F.3d 1104 (9th Cir.

2012). The ALJ must state the reasons why the testimony is unpersuasive and specifically identify what testimony or evidence undermines the claimant's complaints. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (2009); *Morgan v. Comm'r of Soc. Sec. Admin.,* 169 F. 3d 595, 599 (9th Cir. 1999). If the claimant produces objective medical evidence of an underlying impairment, the ALJ may not reject his subjective complaints *solely* on a lack of medical evidence to fully corroborate the alleged severity of his pain. *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005), citing *Bunnell v. Sullivan,* 947 F.2d 341, 345 (9th Cir.1991)(emphasis added). Pain testimony may establish greater limitations than can medical evidence alone. *Id.*, citing SSR 96–7p (1996).

To determine credibility or the lack thereof, the ALJ may engage in ordinary techniques of credibility evaluation, such as considering the claimant's reputation for truthfulness and inconsistencies in claimant's testimony. *Burch*, 400 F.3d at 680, citing *Tonapetyan v. Halter,* 242 F.3d 1144, 1148 (9th Cir. 2001). The ALJ may also consider other factors such as (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) the type, dosage, effectiveness, and adverse side-effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) the claimant's daily activities. *Id.*, citing *Bunnell,* 947 F.2d at 346 (quoting SSR 88–13 (1988)) (superceded by SSR 95–5p (1995)).

In *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 884-85 (9th Cir. 2006), the Court specifically rejected the type of "boilerplate" credibility finding made by the ALJ in this case. The court stated that it "is exactly the type we have previously recognized the regulations prohibit. *See* SSR 96–7p, 1996 WL 374186, at *1[.]" The court also stated that the ALJ did not provide a narrative discussion containing specific reasons for his finding, supported by the evidence in the record. The court stated that "[w]hile an ALJ may certainly find testimony not credible and disregard it as an 'unsupported, self-serving statement,' we cannot affirm such a determination unless it is supported by specific findings and reasoning." *Id.*, citing *Flaten v. Secretary of Health & Human Services*, , 44 F.3d at 1464.

The ALJ's decision denying Plaintiff's application of disability benefits should be reversed because he did not make a legally proper finding regarding the credibility of Plaintiff's testimony as to the severity of his symptoms since his alleged amended onset date. Rather, the ALJ based his

credibility determination solely on the lack of objective medical evidence in the record that would substantiate Plaintiff's testimony. He failed to cite additional reasons why Plaintiff's testimony or other evidence in the record undermined Plaintiff's subjective complaints. In other words, the specific, clear and convincing reasons required by Ninth Circuit case law to reject a claimant's credibility are lacking in this instance.

The Court must decide whether this case should be remanded for an award of disability benefits or for further proceedings on the issue of disability. In answering this question, the court must decide (1) whether the record has been fully developed such that further administrative proceedings would serve no useful purpose; (2) whether the ALJ failed to provide legally sufficient reasons for rejecting the claimant testimony or medical opinion; and (3) whether, if improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand. *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014); *See also Varney v. Sec'y of Health and Human Servs.*, 859 F.2d 1396, 1401 (9th Cir. 1988). Generally, when all three conditions are met the court must remand for an award of benefits. *Garrison*, 759 F.3d 1020–21. If, however, an evaluation of the record as a whole "creates serious doubt as to whether the claimant is, in fact, disabled, then remand for further proceedings is proper. *Id.*

Based on the record as a whole, there is serious doubt whether Plaintiff was, in fact, disabled within the meaning of the Social Security Act since the alleged amended onset date of May 30, 2011. The ALJ found that Plaintiff suffered from severe impairments of degenerative disc disease of the cervical spine and degenerative joint disease of the right knee. AR 24. He found, however, that Plaintiff had the residual functional capacity to perform work at the light exertional level. AR 25.

The medical record significantly lacks evidence to corroborate Plaintiff's testimony that the pain he suffered was completely disabling. As the ALJ stated, the MRI of the cervical spine showed normal cervical alignment. The results also showed mild right and moderate left neural foraminal narrowing at the C6 through C7 level. Otherwise, there was no significant spinal canal or neural foraminal narrowing at any other level. AR 249. Furthermore, the EMG study showed no evidence of peripheral neuropathy, no evidence of cervical motor radiculopathy in either arm, and no evidence of lumber motor radiculopathy in either leg. AR 26, 252. Plaintiff also testified that medication made his pain

tolerable and that he has not had surgery on either his back, neck, or shoulder. AR 60. Plaintiff was referred to a pain management doctor, but had not gone because the office was booked for the year. AR 69. Plaintiff's overall course of conservative treatment for his pain also casts some doubt on whether his symptoms were, in fact, disabling. *See Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (noting that an ALJ's rejection of the claimant's testimony because of her conservative course of treatment was proper). In sum, the medical records do not indicate that Plaintiff's right leg, shoulders, or neck pain reached a level of severity to be arguably disabling or that Plaintiff would be unable to maintain gainful employment at either a light or sedentary level. Therefore, the record as a whole gives rise to substantial doubt as to whether Plaintiff is disabled.

## CONCLUSION

Based on the foregoing, the Court concludes that the ALJ failed to provide legally sufficient reasons to reject the credibility of Plaintiff's testimony regarding the severity of his pain and other symptoms. The ALJ's credibility determination was based solely on the lack of corroborating medical evidence in the record. The ALJ failed to provide any other specific, clear and convincing reason for why he rejected Plaintiff's credibility. However, there is serious doubt on this record as to whether Plaintiff is disabled. Therefore, remand for further proceedings is warranted.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Reversal and Remand (#19) be **granted**, and that the Defendant's Cross Motion to Affirm (#24) be **denied**, and that this case be remanded to the Social Security Administration for further proceedings as recommended.

. . .
. . .
. . .
. . .
. . .
. . .
. . .
. . .

**NOTICE**

Under Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. Appeals may been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). Failure to file objections within the specified time or failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 8th day of April, 2016.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge